IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BARBARA J. KNIGHT,

        Plaintiff,

v.                                       Civil Action No. 5:04-CV-77

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

## I.  Introduction

A.    Background

    Plaintiff, Barbara J. Knight, (Claimant), filed her Complaint on July 16, 2004, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1]  Commissioner filed her Answer on September 23, 2004.[2]

Claimant filed her Motion for Summary Judgment on November 4, 2004.[3]  Commissioner filed her

Motion for Summary Judgment on December 1, 2004.[4]

B.    The Pleadings

        1.    Claimant's Motion for Summary Judgment.[5]

---

[1] Docket No. 1.

[2] Docket No. 2.

[3] Docket No. 6.

[4] Docket No. 7.

[5] Docket No. 6.

2.    Commissioner's Motion for Summary Judgment.[6]

C.    Recommendation

1.    I recommend that Claimant's Motion for Summary Judgment be DENIED because the ALJ was substantially justified in his decision. Specifically, the ALJ properly considered Claimant's subjective complaints of pain. Also, the ALJ gave proper weight to the medical opinions of Dr. Govindan, Dr. Payne and Dr. Nally. Finally, the ALJ posed a proper hypothetical to the VE.

2.    I recommend that Commissioner's Motion for Summary Judgment be GRANTED for the same reasons set forth above.

## II. Facts

A.    Procedural History

On October 23, 1998 Claimant filed for Disability Insurance Benefits (DIB) alleging disability since November 9, 1997. The application was denied initially and on reconsideration. A hearing was held on September 7, 1999 before an Administrative Law Judge (ALJ). The ALJ's decision dated December 16, 1999 denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on September 21, 2000.

On February 23, 2000 Claimant filed her second application for DIB. The claim was initially denied and on reconsideration, and by a hearing decision issued by an ALJ on August 3, 2001.

On July 2, 2002 Claimant filed her third application for DIB alleging an onset date of November 9, 1997. The claim was initially denied and on reconsideration. A hearing was held on

_____

[6] Docket No. 7.

August 14, 2003 before an ALJ. The ALJ's decision dated November 17, 2003 found Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on December 5, 2003.

B.  Personal History

Claimant was 48 years old on the date of the August 14, 2003 hearing before the ALJ. Claimant has the equivalent of a high school education and past relevant work experience as a floral designer, deliverer, and floral/sales clerk.

C.  Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability November 9, 1997 - November 17, 2003:

**Marshall County Ear, Nose and Throat Clinic**
**Phillip B. Mathias, M.D. 8/7/90 Tr. 142**
• I suspect that she has an inner ear problem which may be the beginning of Meniere's Disease

**Wheeling Hospital**
**C. David Burkland, M.D. 3/19/95 Tr. 141**
• Diagnosis: Acute chest pain, bronchitis.

**Reynolds Memorial Hospital**
**David M. Nally, M.D. 2/15/97 Tr. 150**
• Impression: Abdominal and chest pain of uncertain etiology, must rule out pulmonary embolus; also must rule out gallbladder disease.

**Reynolds Memorial Hospital**
**David M. Nally, M.D. 12/15/97 Tr. 164**
• Assessment: Patient is a 42 year old white female presenting a sharp, pinching pain throughout cervical spine radiating into (illegible) and a burning LB pain radiation into R LE, posterior aspect.

**Wheeling Hospital**
**Srini Govindan, M.D. 12/16/98 Tr. 175**
• Diagnosis: No evidence of acute radiculopathy, no evidence of primary muscle disease.

**David M. Nally, M.D. 11/20/98 Tr. 176**
- Diagnosis: Chronic neck and low back pain, muscle spasms shoulders and back - strain and TMJ dysfunction.

**Reynolds Memorial Hospital**
**D. A. Antico, M.D. 4/16/92 Tr. 196**
- Impression: Normal Chest.

**Reynolds Memorial Hospital**
**H. Neiberg, M.D. 11/8/93 Tr. 197**
- Impression: Negative Exam.

**Reynolds Memorial Hospital**
**Howard Neiberg, M.D. 2/17/97 Tr. 200**
- Impression: Normal. Scout film normal. There is a normal swallowing mechanism without hiatal hernia or reflux. The stomach, duodenal bulb and sweep are normal.

**Reynolds Memorial Hospital**
**Howard Neiberg, M.D. 2/17/97 Tr. 201**
- Impression: Right middle lobe infiltrate, very little change from the previous exam, no new infiltrates.

**Reynolds Memorial Hospital**
**Howard Neiberg, M.D. 2/17/97 Tr. 202**
- Impression: Negative.

**Reynolds Memorial Hospital**
**Wendell E. Jones, M.D. 11/11/97 Tr. 204**
- Impression: Mild degenerative changes at C5-6; muscle spasm is suggested by cervical straightening.

**Reynolds Memorial Hospital**
**Wendell E. Jones, M.D. 11/11/97 Tr. 205**
- Impression: Mild thoracic scoliosis.

**Reynolds Memorial Hospital**
**Howard Neiberg, M.D. 11/20/97 Tr. 206**
- Impression: Minimal degenerative changes C4-5 and C5-6.

**Reynolds Memorial Hospital**
**Howard Neiberg, M.D. 12/8/97 Tr. 207**
- Impression: Mild facet joint arthropathy L5-6; otherwise negative.

**Reynolds Memorial Hospital**

**Howard Neiberg, M.D. 12/8/97 Tr. 208**
- Impression: Negative.

**Reynolds Memorial Hospital**
**Howard Neiberg, M.D. 12/8/97 Tr. 209**
- Impression: Mild facet joint arthropathy, primarily L5-S1. Otherwise negative.

**Wheeling Hospital**
**David Nally, M.D. 9/15/98 Tr. 211**
- Diagnosis: Few atypical squamous cells of undetermined significance favoring a reactive process and fungal organisms morphologically consistent with candida species.

**Reynolds Memorial Hospital**
**Wendell E. Jones, M.D. 9/17/98 Tr. 212**
- Impression: No evidence of malignancy.

**Thomas J. Schmitt, M.D.  12/22/98 Tr. 213-215**
- Impression: Multiple arthralgias. Severe limitation of range of motion of cervical spine and lumbar spine.

**Valley Radiologists, Inc.**
**William L. Noble, M.D. 12/17/98 Tr. 216**
- Impression: Borderline spinal canal size with mild degenerative changes.

**Physical Residual Functional Capacity Assessment**
**1/9/99 Tr. 216-224**
- Exertional limitations: Occasionally 20lbs., frequently 10 lbs., stand or walk 6 of 8 hours, sit 6 of 8 hours, unlimited push and pull.
- Postural limitations: All occasionally.
- Manipulative limitations: Limited handling with right hand only.
- Visual limitations: None established.
- Communicative limitations: None established.
- Environmental limitations: Avoid all exposure to hazards (machinery, heights, etc...). All others unlimited.
- There is no treating or examining source statement(s) regarding the claimant's physical capacities in file.

**Psychiatric Review Technique**
**Samuel Goots, Ph.D. 1/11/99 Tr. 225-233**
- Medical Disposition: No medically determinable impairment.

**Physical Residual Functional Capacity Assessment**
**4/16/99 Tr. 234-243**
- Exertional limitations: None established.

- Postural limitations: None established.
- Manipulative limitations: None established.
- Visual limitations: None established.
- Communicative limitations: None established.
- Environmental limitations: None established.
- There is no treating or examining source statement(s) regarding the claimant's physical capacities in file.

**Srini Govindan, M.D. 7/29/99 Tr. 244**
- Diagnosis: Headache post traumatic by history; TMJ dysfunction post traumatic by history; cervical radiculopathy to be ruled out; lumbosacral radiculopathy to be ruled out.

**Physical Capacity Evaluation**
**Srini Govindan, M.D. 8/20/99 Tr. 246-247**
- Can stand or walk 3 of 8 hours.
- Can sit 3 of 8 hours.
- Lift 0-5 lbs; lifting 8 lbs. causes pain.
- Lifting can be performed occasionally, once an hour.
- Can use hands for repetitive grasping and fine manipulation. Cannot use hands for repetitive pushing and pulling.
- Can use feet for repetitive movements.
- Able to bend, squat and climb occasionally but cannot crawl.
- Able to reach above shoulder level
- Conditions have lasted 12 continuous months.

**Fred J. Payne, M.D. 4/21/99 Tr. 251-252**
- Diagnosis: Rule out cervical radiculopathy (cervical disc protrusion).

**Wheeling Hospital**
**Fred J. Payne, M.D. 6/23/99 Tr. 256**
- Impression: Right central spur or hard disc at C4-5, very slight central spur at C5-6, both with myelographic ventral defects and slight narrowing of the foramina bilaterally as well.

**Wheeling Hospital Radiology**
**Fred J. Payne, M.D. 7/26/99 Tr. 250 - 260**
- Impression: Right central probable disc protrusion at C4-5 and small central disc protrusion at C5-6 with foraminal narrowing at C5-6 and spinal stenosis at both levels.

**Wheeling Hospital**
**Fred J. Payne, M.D. 8/11/99 Tr. 261**
- Impression: No evidence of entrapment neuropathy
- Chronic nuerogenic changes C5-7 distribution with more involvement on the left.

Correlate with any abnormalities in the MRI or myelogram for radiculopathy.

**University Health Associates**
**John C. France, M.D. 11/18/99**
- Assessment: There is no objective evidence of myelopathy at this time.

**Wheeling Hospital Pathology**
**David Nally, M.D. 10/19/99 Tr. 443**
- Diagnosis: Reactive Cellular Changes.

**Physical Residual Functional Capacity Assessment**
**Timothy Huffman 4/18/00 Tr. 456-463**
- Exertional limitations: Occasionally 50 lbs., frequently 25 lbs., stand or walk 6 of 8 hours, sit 6 of 8 hours, unlimited push and pull
- Postural limitations: All occasionally.
- Manipulative limitations: None established.
- Visual limitations: None established.
- Communicative limitations: None established.
- Environmental limitations: None established.
- There is no treating or examining source statement(s) regarding the claimant's physical capacities in file.

**Physical Residual Functional Capacity Assessment**
**7/20/00 Tr. 477-484**
- Exertional limitations: Occasionally 50 lbs., frequently 25 lbs., stand and walk 6 of 8 hours, sit 6 of 8 hours, unlimited push and pull.
- Postural limitations: All frequently.
- Manipulative limitations: None established.
- Visual limitations: None established.
- Communicative limitations: None established.
- Environmental limitations: Avoid concentrated exposure to extreme cold and heat. All others unlimited.
- There is no treating or examining source statement(s) regarding the claimant's physical capacities in file.

**University Health Associates**
**Anthony DiBartolomeo, M.D.  3/14/01 Tr. 497-498**
- Assessment: Fibromyalgia, which the patient blames on her motor vehicle accident, with a pending legal case.

**Physical Residual Functional Capacity Assessment**
**8/19/02 Tr. 593-600**
- Exertional limitations: Occasionally 50 lbs., frequently 25 lbs., stand or walk 6 of 8 hours, sit 6 of 8 hours, unlimited push and pull.

- Postoral limitations: None established.
- Manipulative limitations: None established.
- Visual limitations: None established.
- Communicative limitations: None established.
- Environmental limitations: None established.
- There is no treating or examining source statement(s) regarding the claimant's physical capacities in file.

**Reynolds Memorial Hospital**
**Debra L. Henry, M.D. 3/24/02 Tr. 662-663**
- Diagnosis: Bronchitis, chronic neck and shoulder pains, status post motor vehicle accident.

**Reynolds Memorial Hospital**
**Howard Neiberg, M.D. 3/25/02 Tr. 664**
- Impression: Suspect active infiltrate right middle lobe. Please correlate. Chronic obstructive pulmonary disease.

**9/27/02 Tr. 675**
- Impression: Back, thoracic and cervical pain. Resolving UTI and bronchitis. Depression.

**9/9/02 Tr. 676**
- Impression: Bronchitis. Chronic back pain.

**8/20/02 Tr. 677**
- Assessment: MVA 1997 with cervical strain/spasm, trapezius strain and lumbar strain. Anxiety. History of borderline Type II diabetes. Vaginal candidiasis.

**5/24/02 Tr. 679**
- Impression: Motor vehicle accident with cervical strain and spasm; trapezius strain and lumbar strain as well. Chronic fatigue.

**Psychiatric Review Technique**
**Frank D. Roman 11/1/02 Tr. 703-716**
- Medical Disposition: Impairment(s) not severe.
- Category Upon Which Medical Disposition is based: 12.04 Affective disorders and 12.06 Anxiety-Related Disorders.
- Affective Disorders: Depression

**Physical Residual Functional Capacity Assessment**
**Hugh M. Brown, M.D. 11/25/02 Tr. 717-724**
- Exertional limitations: Occasionally 50 lbs., frequently 25 lbs., stand or walk 6 of 8 hours, sit 6 of 8 hours, unlimited push and pull.
- Postural limitations: None established.

- Manipulative limitations: None established.
- Visual limitations: None established.
- Communicative limitations: None established.
- Environmental limitations: None established.

**3/25/03 Tr. 729**
- Impression: Chronic neck pain.

**Physical Residual Functional Capacity Questionnaire**
**David M. Nally 11/11/02 Tr. 731-735**
- Diagnosis: neck, shoulder and back pain.
- Psychological conditions affecting patient: Depression, personality disorder, anxiety and physical condition.
- Patient's pain frequently interfere's with attention and concentration.
- Patient can continuously sit for 15 minutes or one hour, can stand continuously for 15 minutes or one hour.
- In an 8 hour day patient can sit for less than 2 hours and stand for less than 2 hours.
- Patient must take breaks to walk every 45 minutes; walking breaks will last 10 minutes.
- Can occasionally care less than 10 lbs. and can never carry anything heavier than 10 lbs.

D.    Testimonial Evidence

1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr.524-28, 530, 539-44, 547-49):

Q    About how tall are you?

A    5' 8".

Q    About how much do you weigh?

A    A hundred and five.

Q    One zero five?

A    Yes.

Q    How long have you weighed about that?  Say plus or minus five pounds, 100 to 110.

A     Probably three years.  I lost like 40 pounds since the accident, and I've gained some of it back.

Q     Since - - and the accident you're referring to is the motor vehicle accident in - -

A     Yes.

Q     - - 1997?

A     Yes.

Q     Tell me about that.  What happened to - - did somebody hit you from behind?

A     I was going west on 470, and I was in the right-hand lane, and I was going about 65 miles an hour.  And there was a piece of tractor trailer tire, a big piece, in the passing lane, and the car that was passing me must have - - it did hit it, but I don't know if it spun around or whatever, it went out of control, but the next thing I knew is it hit the front end of my car which sent me into the guardrail.  And I thought we was going to flip over, but we didn't.  We bounced off of it and spun around backwards, and then we hit back by the license plate, and that kind of threw me straight forward and my son who was sitting in the seat besides me, he let out this scream, and I was able to jerk the wheel and make it hit the guardrail.

Q     You were, you were driving?

A      Yes.  I was able to grab the wheel and make it hit the guardrail again, left front.  And then it hit - - went around a little bit and hit the left back, and then we slid down the guardrail.

Q     So - -

A     Like all four sides of my car was damaged.  I'm sorry.

Q     That's okay.  So were you hospitalized?

A        No, I was just dazed, I think, and it wasn't until that evening that I started hurting and the next day, I knew I had to go to the doctors.

*               *               *

Q        All right.  So tell you why as you sit here now today why you're not able to work. Tell me what you feel is the most serious problem that affects your ability to work.

A        Well, the pain in my neck, shoulders, and back.  Just movement, sitting, standing, walking.

Q        And when you say in your neck, shoulders, and back, are you talking about your, your back, you know, up at your neck level, is that - -

A        From the - -

Q        Base of your skull?

A        - - top of my neck on both sides, it goes down into my shoulders, and then goes clear down to my back, and then my lower back is like - - it goes clear across my back, left and right side.

Q        Meaning about, you mean like the hips or talking about your waist level you have pain?

A        About waist level, but sometimes it goes down my right hip.

Q        What do you do for that?

A        Laying down on a heating pad is the best thing for me.

*               *               *

Q        Now, how often do you have pain in your back, neck, and shoulders?

A        It's constantly there unless like I'm laying down, and that's when it goes away.

Q       How about if you use the heating pad does that - -

A       That helps.  It makes it go away.

Q       And anything else you do for your, your pain besides take the medication and, and use the - - laying down and using a heating pad?

A       I've used some of them creams, and it doesn't last very long, but it helps somewhat, not a lot.

Q       Did you ever have physical therapy for your - -

A       I had 32 physical therapy visits and had all different kind of treatments, the ultrasound, use traction, massages, but there was no improvement.

Q       No?

A       No progress.

Q       Didn't give you any relief at all?

A       It gave me relief while I was in there, like the heat, heating pad, you know, they put on my back and neck, and then by the time I got dressed and was walking out, the pain would start coming back, just - -

Q       Do you have any other problems that you feel keep you from working besides the neck and back pain that you were talking to me about?

A       I have chronic fatigue and Epstein-Barr virus, and I'm just real tired and weak, and ache.

Q       And how long have you had that?

A       I was diagnosed with that in 1990.

Q       But as I understand it, you were, you were able to work.

A       Yes, part time.  I mean it was hard, but I was able to do it.

Q       Okay.  Do you think that those conditions have changed any since you were working?

A       They have gotten worse, they've gotten worse.

Q       In what respect?

A       My body, my mind, concentration.

                          *                    *                    *

Q       Anything else you want to tell me about your condition or why you're not able to work?

A       Sometimes my legs and arms get real weak.  I mean I've fallen like down to the ground just, just walking, just out of nowhere, and if I stand too long or I walk too long, they get tingling and numbness - -

Q       Where?

A       - - from - - it starts from like my waist down, and then - -

Q       How about when you say too long, what do you mean by that?

A       Like right now, I feel like they're getting tingly, I need to get up, going to get up.  And my hands, sometimes whenever it gets cold, too, it makes it worse, and then they get wobbly and weak and tingly, and sometimes like when I'm driving my gas - - my foot will go off the gas pedal.  I'm just not real steady on my feet.

                          *                    *                    *

A       It's just, you know, I'm really weak and tired.  I can sleep all night, get a good night's sleep, get up in the morning, and it's just like I haven't had any sleep.  You know, it's

just sometimes I'll sleep - - get a good night's sleep and there's been time when I slept like almost all day, just get up, go the bathroom and get something to eat and go back to bed, and then I'll sleep again that night.  And then when I get up the next day, I'll still feel like I haven't had any sleep, but it's not as bad.  You know, it's just where I, I don't have to lay in bed all the time.  But there's  times when I do.  It's just I can't believe a person could sleep that much, just - -

*          *          *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q       Do you have any problems with your arms or your hands at all?

A       My hands, they tingle and - -

Q       Tingle the same way your legs tingle or - -

A       Yeah, they feel like they go numb like - -

Q       When they go numb like that, do you have difficulties lifting things or holding on to things?

A       Yeah, when they're numb like that, you know, it seems to get worse.

Q       Do you drop things?

A       Yes.

Q       How often does this happen?

A       It happens a lot when I put the key in the front door.  It seems like the key - - and the ignition of the car, I'm just all the time dropping keys.

Q       When you're doing the bills that we were just talking about do you have any problems shuffling the papers around and putting them in the envelopes?  Does that create a

difficulty with your hands?

A       Yeah, if they're numb, it just seems that my hands don't want to go where they - - I want them to go, and my feet get like that, too.

Q       What about your arms?  Do you have any trouble raising your arms above shoulder level?

A       Yes, there's pain that goes in my neck and shoulders and back.

Q       Can you do your own hair?

A       Yes, but I don't do much to it.  I blow it dry for a minute of two, and that's it, because it hurts to - - sometimes I'll put rollers in it, you know, if I'm not hurting real bad.

Q       Tell me about the Epstein-Barr virus that you've told us you have.  What does that do to you?  Is that in conjunction with the chronic fatigue or is that something else?

A       Well, chronic fatigue is worse than the Epstein-Barr virus, and I had tests done to rule out different things.  And you run like a low-grade fever, you're achy.  I have trouble concentrating.  I have this ringing and static and noise in my ear consistently, 24/7, too.

Q       Does that interfere with your concentration?

A       Yeah, that interferes a good bit.  And the - -

Q       And it interferes - - I'm sorry, I didn't understand.

A       It interferes a good bit, you know, with that noise just constantly in there.

Q       And how does it interfere?

A       It's just hard to think.  It's just - -

Q       Now, you told us about a time you slept all day long after sleeping the night before.  On an average day, a normal day, how many times are you sleeping or taking a nap

15

during the day?

A    I take naps frequently.

Q    Okay.

A    An hour or two.

Q    An hour or two how many times a day on an average day?

A    Usually one, but there's days when, you know, it's a couple times, but usually one.

Q    Now, are these naps that you are forced to take or that you have scheduled yourself to take?

A    I usually fall asleep watching TV, because, you know, I just - - I'll wake up and there will be a different movie on or something.

Q    Have you ever fallen asleep in any other situation?

A    Oh, yeah.  I fall asleep in doctors' offices, in church.

Q    Have you had any sleep studies done?

A    No.

Q    What other problems does the chronic fatigue cause you to have?

A    Like nausea and I have like a dizziness, sometimes when I bend over and get back up, things start to go black, you know, go black.

Q    Are you on any kind of high blood pressure medication?

A    No.

Q    Does the dizziness interfere with your ability to walk or move other than getting up?

A      Sometimes my balance is just not - - especially whenever it's dark or I have my eyes closed, it's just like I have to hold on to something, but it gets, you know, worse with darkness, but sometimes with my legs and feet going tingly and weak and wobbly, I look like I'm drunk, you know, like - -

Q      Now, initially after you had the motor vehicle accident, what was your worst problem?

A      It was the pain in my neck and shoulders.

Q      Has that pain gotten any better or is the same or is worse since then?

A      It's gotten worse.

Q      Are you able to move your head right and left?

A      I have limited neck movement.

Q      How about looking up and down?

A      It's hard to look up and down.  If I have something to like rest my head on, that helps because - - or lean my back of my head against like a wall, that helps.

Q      If you were looking up, you mean?

A      Well, just leaning against something to take the pressure off my - - you know, like this, that helps some.

Q      You're indicating your hands are holding - -

A      My neck and shoulders.

Q      - - are holding your face.

A      Yeah.

*             *             *

Q       What bothers you after walking two blocks?

A       My legs start getting numb and tingling and weak, my back starts hurting.  I mean my back starts hurting worse, because it's - -

*                    *                    *

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 552-55):

Q       Okay.  Okay, they say - - all right, I want you to assume a hypothetical individual the age, education, and experience as the claimant, who would have the ability to do light work, but would not be able to do work that required   - - just a second - - has the ability to do light work, in other words would be able to stand or walk for a total of up to six hours in an eight-hour-day, but would have to have the ability to change positions for a few minutes, standing and walking approximately every half hour; would not be able to do jobs that required the individual to do - - to rotate the head or neck more than 30 degrees in each direction; no flexing of the neck more than 45 degrees, and no extension of the neck; no bending more than 45 degrees.

A       I'm sorry, Your Honor, no extension of the neck?

Q       No extension of [INAUDIBLE].

A       Okay.

Q       No bending more than 45 degrees, and no more than occasional twisting of the spine and no reaching overhead.  Would there be any unskilled jobs that such a hypothetical person could do in the local or national economy?

A       Okay, and just one clarification, if I may, sir?

18

Q        Yes.

A        Any sitting restrictions?

Q        The claimant would be able to sit for at least six hours in an eight-hour-day, but would have to be able to change positions about once an hour for a few minutes at a time.

*                *                *

A        Okay.  The following would fit within the hypothetical as given.   Work as a locker room attendant.  You have 75,000 for the national, regional, 400 - -

Q        And the region is?

A        State of West Virginia.

Q        Okay.

A        Storage facility rental clerk, 85,000 for the national, 300 regional; information clerk, 95,000 national, 800 regional, and that's a sampling, Your Honor.  It's consistent with the <u>DOT</u> but not all-inclusive.

Q        All right.  I'm going to ask you another hypothetical at the, at the sedentary level with the limitations that - - hypothetical individual, same age, education, and work experience as the claimant; they would be limited to doing - -

*                *                *

ALJ        The claimant would be limited to doing sedentary work, would be able to sit for at least six hours in an eight-hour-day but would have to be able to get up and move around for a few minutes approximately once every hour; would be able to stand or walk for at least a total of two hours in an eight-hour-day, but would be limited to standing for no more than a half hour at a time and walking for no more than 15 minutes at a time.  We have the limitations

that are used on her neck that I gave you in the first hypothetical and no overhead reaching. Would there be any unskilled jobs that such a hypothetical person could do in the local or national economy?  Ma'am, how often do you see Dr. Nally?

                    *               *               *

    CLMT        Oh, probably every two or three months.

    VE          Okay, Your Honor.

    ALJ         All right.

    VE          Work as a laminated Roman numeral I, there are 75,000 national, 400 for the region; plastic design applier, 60,000 for national, 300 for the regional; receptionist, 1 million for the national, 2,000 for the regional.  And it's the same thing, you know, it's consistent with the <u>DOT</u> and no all inclusive.

    ALJ         All right.  I'm going to ask you another hypothetical.  I want you to assume that - - 12F, is that where Govindon's RFC is?

    ATTY        Um-hum.

    BY ADMINISTRATIVE LAW JUDGE:

    Q       I want you to assume a hypothetical individual the same age, education, and work experience as the claimant that would be limited to lifting eight pounds occasionally; would only be able to stand or walk three hours in an eight-hour-day and sit for three hours in an eight-hour-day.  Would there be any unskilled job that such a hypothetical person could do in the local or national economy?

    A       No, sir.

    Q       Because it's not full time?

A        Well, it is full time when you take into account the three hours walk, three hours stand, three hours sit.  However, primarily with these restrictions, the jobs would be stand or sit–

Q        Yeah.

A        - - so eliminating the walking - -

Q        I'm really interpreting this is him saying - - because he's only checked three hours - - I think the total of what he's saying is the total of three if you can't stand or walk for more than three hours - -

A        Combined.

Q        Right.

A        Right, because it's not full-time work.

Q        Okay.  I want you to assume a hypothetical individual the same age, education, and work experience as the claimant that would be limited to sitting for two hours in an eight-hour-day and standing walking for a total of two hours in an eight-hour-day.  Would there be any unskilled - - full-time, unskilled jobs that such a hypothetical person could do in the local or national economy?

A        No, there would not be.

Q        Would there be any full-time, unskilled jobs a hypothetical person the age, education, and work experience as the claimant do if the hypothetical individual was off work three times a month on an ongoing basis due to her impairments?

A        There is no work.

*                *                *

Q        In the earlier hypotheticals, Mr. Czuczman, would any of them be reduced if this

individual suffered from problems with her neck that involved her hands as well? Meaning sensory loss in her thumbs, in both thumbs in both upper hands, also her ability to use her hands repetitively for pushing or pulling or manipulating constantly for more than a third of the day. Would any of the jobs you've indicated earlier be eliminated with that restriction?

ALJ    Are you saying she wouldn't be able to use her hands for a third of the day for - -

ATTY  At least a third of the day because of the problems of numbness and sensory loss, inability to function and grasp and use them on a repetitive basis.

ALJ    Okay.

VE    All right. The three sedentary that I utilized, you only have occasional, and the reason why - - the plastic design applier, laminator, once the machine's loaded, her job is to just to watch the machine. With the receptionist, occasional if you pick up the phone, occasional if you have to write something down. The ones as the, the light exertional, the locker room attendant would be prevented with that. Storage facility rental clerk and information clerk would not be. Primarily, you're providing the information to an individual, what type of lockers are available and all that's involved with that, what the rates are, therefore, you're really not handling something more than on an occasional basis or less than occasional with that. But the locker room attendant, that would be a problem especially when it's a busy day and you have the day shift.

Q    Thank you. If you were to assume this individual due to Epstein-Barr and chronic fatigue would need unscheduled breaks where she may need to close her eyes for 10 to 15 minutes to regroup or in fact may need two days off a month completely due to fatigue, would such an individual be employable?

ALJ    How much of the - - how often are we talking about these unscheduled breaks for 15 minutes?

ATTY I'd say an unscheduled break every hour and a half during the course of the day.

ALJ    You're asking that in - - as a separate question for each limitation?

ATTY Yes.

ALJ    Do you understand?

VE    I, I understand. I will, I will say with the three positions in the three positions in the light category, it's prevented. And the reason why it's prevented - - whenever you have a situation where you're dealing with customers and people, the most you're looking at is five minutes for every hour that the person could get off task, and we're talking about 10 to 15 - - if you're gone 15 at one time, 10 minutes at one time, no, it's, it's not going to be a good example for people coming to that establishment to see somebody sitting with their eyes closed that often. And the same thing with the receptionist. Now, with the plastic design applier, laminator, one - - it's a two, two prong issue - - first, an individual has to produce 45 minutes of work for every hour to do any type of unskilled job when they're working with things. In order for her to have this ability to take this break, she would have to work faster for the first part of that hour, so that she could take 10 minutes every one and a half hours to close her eyes and take a little bit of a break. So it becomes an issue of whether or not the person is capable of going beyond what is considered the minimal acceptable amount of work that somebody is expected to do in an hour. Do you follow that? She would have to work a lot faster than what someone would be considered (INAUDIBLE).

ATTY So she would not be able to do this job if she couldn't pick up the pace at the

beginning?

VE      That's - - thank you, yes.

ALJ     And then she asked you the second question which was about the two days a month on a continuous basis.

VE      Yeah, two days is the limit.  Anything over two days, a person would not be able to maintain any unskilled employment.  So the maximum is two days.

ATTY What would be the - -

ALJ     So the answer would be she couldn't do those jobs if she was off two days a month?

VE      Yes.

ATTY If she were off two days a month, and also needed these unscheduled breaks, would she be able to do those jobs?

VE      No.

ATTY Okay.  Because she'd be off - task too much?

VE      Well, plus the two days and including the time that she's taking off, that' s not good for morale for other employees to see that for full-time work.  Now, if it was part-time work, that's a different exception.

*               *               *

E.      Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

- Smoking half a pack a day since age 17. Drinks on occasion. (Tr. 774-75).

- Drives once or twice a week. Able to drive 30 miles. (Tr. 749).

- Visits sister and mother-in-law. Has a dog. (Tr. 749).

- Cleans a church. (Tr. 749).

- Walks for exercise. Can walk two blocks without resting. (Tr. 761, 783).

- Takes son to his treatment. Gives son his medication. (Tr. 764-65).

- Watches television. Talks to relatives on the telephone. (Tr. 765).

- Washes dishes. Cooks. Sews. (Tr. 766).

- Attends church on sundays. Goes fishing. (Tr. 766).

- Washes clothes, irons. Vacuums and dusts. Makes the bed. (Tr. 769-70).

- Can lift a gallon of milk. (Tr. 783).

- Can walk for an hour, sit for two hours, stand for an hour and lay down for four hours in an eight hour day. (Tr. 782-83).

- Occasionally uses the computer for web surfing. (Tr. 784).

- Able to get dressed. (Tr. 785).

### III.  The Motions for Summary Judgment

A.  Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant contends that the ALJ erred when he assessed Claimant's subjective complaints of pain. Also, Claimant maintains that the ALJ did not properly consider the medical opinions of record. Lastly, Claimant asserts that the ALJ erred when he posed the hypothetical to the vocational expert (VE).

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner maintains that the ALJ properly accounted for Claimant's subjective complaints of pain. Also, Commissioner asserts that the ALJ gave proper weight to the medical opinions of record.

B.    The Standards.

1.    Summary Judgment.    Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.    Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment.   The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.　Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.　Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hayes v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.　Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.　Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

10. <u>Social Security - Ultimate Issue</u>. Whether an individual is disabled or able to work is an issue reserved for the Commissioner. SSR 96-5p. Opinions as to disability or ability to work given by a treating source can "never be entitled to controlling weight or given special significance." <u>Id</u>.

11. <u>Social Security - Treating Physician - Controlling Weight</u> - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). <u>See also</u> <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984); <u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990).

12. <u>Social Security - Subjective Complaints of Pain</u>. Claimant's statements alone are not enough to establish that there is a physical or mental impairment. 20 C.F.R. §§ 404.1528(a), 416.928(a). Claimant's statement about her pain or other symptoms will not alone establish that

claimant is disabled.  Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Pain is not disabling *per se*, and subjective evidence of pain cannot take precedence over objective medical evidence or lack thereof. Id. at 592 (citing Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986)).

13.     Social Security - Claimant's Credibility - Pain Analysis.   The determination of whether a person is disabled by pain or other symptoms is a two step process.  First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged.  Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record.  Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

14.     Social Security - Combined Impairments. "Congress explicitly requires that 'the combined effect of all the individual's impairments' be considered 'without regard to whether any such impairment if considered separately' would be sufficiently severe." Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989) (citations omitted).  "[T]he Secretary must consider the combined effect of a claimant's impairments and not fragmentize them. Id. "[T]he ALJ must adequately explain his or her evaluation of the combined effects of the impairments. Id.

C.     Discussion

1. Subjective Complaints of Pain

Claimant contends that the ALJ erred when he assessed Claimant's subjective complaints of pain. Commissioner counters that the ALJ properly considered Claimant's subjective complaints of pain.

The determination of whether a person is disabled by pain or other symptoms is a two step process.  First, the ALJ must expressly consider whether the claimant has demonstrated by

objective medical evidence an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996). In addition, pain is not disabling *per se*, and subjective evidence of pain cannot take precedence over objective medical evidence or lack thereof. <u>Id.</u> at 592 (citing <u>Gross v. Heckler</u>, 785 F.2d 1163, 1166 (4th Cir. 1986)).

The ALJ determined that "claimant's testimony regarding the nature and extent of her impairment is not fully credible." (Tr. 282). In light of the medical record the ALJ stated that "[t]he clinical findings reported by the treating and examining sources fail to support the degree of pain and functional limitations alleged by the claimant." (Tr. 282). This satisfies the first prong of <u>Craig</u>. The ALJ then considered Claimant's credibility of her subjective allegations of pain in light of the entire record. The ALJ stated that "[d]espite her complaints of impaired concentration and memory, the claimant is able to watch a lot of television and maintain the at least modest amount of concentration and memory necessary for this activity. She is able to drive her vehicle, including the trip to the hearing. She monitors her son's activities. The claimant testified she had applied for work as an assistant service representative after her accident, but that she did not get the job. She testified at the hearing that she had worked on a part-time basis the past two months. Although she complained of constant pain unless lying down, she has reported obtaining complete relief from her pain when taking Talwin (Exhibit C-5F). She testified at the hearing that she had smoked one-half pack of cigarettes per day since she was 17 years old. However, when seen for the emergency room treatment on March 2002, she reported that she continued to smoke one pack of cigarettes per day (Exhibit C-4F). When initially seen at the current treatment clinic

on May 24, 2002, she gave a history of smoking about a pack of cigarettes per day (Exhibit C-5F). Further, when seen for the consultative examination by Dr. Kluge on October 30, 2002, the claimant reported that she had smoked a pack of cigarettes a day for the past 15 years." (Tr. 282). The ALJ considered claimant's subjective complaints of pain in light of the entire record in accordance with the second prong of <u>Craig.</u> Therefore, the ALJ properly assessed Claimant's credibility as to her subjective complaints of pain.

## 2. Opinion of Treating Physician

Claimant asserts that the ALJ improperly disregarded the opinions of Claimant's treating physicians. The Commissioner counters that proper weight was given to the treating physicians' opinions.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. § 416.927(d)(2). While the credibility of the opinions to the treating physician is entitled to great weight, it will be disregarded if there is persuasive contradictory evidence. <u>Evans v. Heckler,</u> 734 F.2d 1012 (4th Cir. 1984).

Claimant's argument that the ALJ failed to consider the opinions of Dr. Nally, Dr. Payne and Dr. Govindan is without merit. The opinions of these physicians were not supported by objective evidence and were therefore properly given little weight. The ALJ found that Dr. Nally's findings are not based on techniques, but are merely a "recitation of the claimant's subjective complaints." (Tr. 284). In addition, the ALJ also found that the "opinions of Dr. Govindan are based primarily on Claimant's subjective complaints and not the clinical findings in

the record." (Tr. 286). Further, Dr. Govindan's physical capacity evaluation on August 20, 1999, makes no reference that his findings were based on medically acceptable clinical and laboratory diagnostic techniques. (Tr. 285). When the doctor was asked to report on his clinical findings, he responded that "pain, spasm, and weakness affected the claimant." (Tr. 285). Finally, Dr. Payne's opinion was also made without any objective medical evidence. Dr. Payne stated that he was "not certain as to whether the radiologic findings of date explain all of [Claimant's] symptoms." (Tr. 286). Dr. Payne referred Claimant for further evaluation to Dr. France. Dr. France found that "claimant did not have findings significant enough on her radiographic studies to give her myelopathy and that there was a large component of psychosocial overlay with the claimant's problem." (Tr. 286).

Also, the opinions of Dr. Nally, Dr. Govindan and Dr. Payne are inconsistent with other substantial evidence in the case record. Dr. Nally diagnosed Claimant as having psychological conditions affecting her physical condition in the form of depression, anxiety, and personality disorder." (Tr. 277). Contrary to this opinion, the State Agency psychological consultant found that "the functional limitations associated with the claimant's impairments, when evaluated under the "B" and "C" criteria, are not of a level of severity to establish the presence of a severe impairment."(Tr. 280). Therefore, the Claimant has "no severe mental impairment." (Tr. 279). In addition, the opinions are inconsistent with the findings of Dr. Zaleski, who "reported that no objective findings would substantiate the claimant's severe complaints of dysfunction and pain." (Tr. 283). Dr. France, whom Dr. Payne referred the Claimant to, reported that "claimant did not have findings significant enough on her radiographic studies to give her myelopathy and that there was a large component of psychosocial overlay with the claimant's problem." (Tr. 286). He

stated that he encouraged the claimant to continue range of motion exercises and try to lead as normal and active life as possible.  This advice is contrary to the sedentary lifestyle adopted by the claimant and her lack of exercising." (Tr. 283). The opinions of Dr. Nally, Dr. Govindan and Dr. Payne that the Claimant should refrain from work are inconsistent with other substantial evidence of the record.

The opinions of Dr. Nally, Dr. Payne, and Dr. Govindan, are not based on medically acceptable clinical and laboratory diagnostic techniques and are inconsistent with other substantial evidence in the record.  Therefore, the ALJ properly afforded lighter weight to these medical opinions.

### 3. Impairments

Claimant asserts that the ALJ erred in not taking the Claimant's fibromyalgia diagnosis into consideration when determining her overall pain and limitations. Commissioner counters that the ALJ's determination of pain and limitations was proper.

The diagnosis of fibromyalgia first appears in an assessment made by Dr. DiBartolemeo. His assessment states that "patient blames (fibromyalgia) on her motor vehicle accident." (Tr. 497). There is no objective medical evidence to support that the claimant's self-diagnosis was proper. In fact, Dr. DiBartolemeo reported that "he discussed with the claimant the fact that 90 percent of the people with fibromyalgia do not have a traumatic incident in their recent past and the fact that fibromyalgia is a condition that waxes and wanes." (Tr. 283).  Despite this lack of evidence, the ALJ did take Claimant's diagnosis into consideration. The ALJ found that Claimant had fibromyalgia that was considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b). (Tr. 290).  In making the RFC determination, the ALJ took Claimant's

diagnosis into consideration along with Claimant's subjective complaints of pain which he found not to be credible as previously discussed. Therefore, ALJ did not err in determining Claimant's pain and limitations.

### 4. Combined Impairments

Claimant contends that the ALJ did not properly consider the cumulative effect of Claimant's impairments as they relate to her pain level. Commissioner counters that the ALJ properly considered the combination of Claimant's impairments in assessing her ability to work.

"Congress explicitly requires that 'the combined effect of all the individual's impairments' be considered 'without regard to whether any such impairment if considered separately' would be sufficiently severe." Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989) (citations omitted). "[T]he Secretary must consider the combined effect of a claimant's impairments and not fragmentize them. Id. "[T]he ALJ must adequately explain his or her evaluation of the combined effects of the impairments. Id.

The ALJ found that the medical evidence establishes that the claimant has severe impairments related to her complaints in the form of chronic cervical strain with cervical disc disease, L5-6 central stenosis, and fibromyalgia. (Tr. 279). The ALJ also determined that the claimant's generalized arthritic pain was related to her fibromyalgia and not the history of chronic fatigue syndrome and Epstein-Barr virus. (Tr. 279). In addition, the ALJ took into consideration that the Claimant had "no severe mental impairment." (Tr. 279). In determining Claimant's residual functioning capacity the ALJ included limitations related to all of Claimant's impairments. The ALJ stated that he took the findings reported by Dr. Govindan and Dr. Payne and accommodated them in the limitations of Claimant's RFC. (Tr. 286, 287). For instance, the

ALJ determined that Claimant needs to be allowed to change positions every hour; she is unable to rotate head or neck more than 30 degrees; she cannot perform more than occasional twisting of the spine nor can she perform overhead work. (Tr. 283-284). Therefore, the ALJ properly considered the combination of Claimant's impairments in determining Claimant's RFC.

## 5. Hypothetical

Claimant contends that the ALJ posed an improper hypothetical to the vocational expert (VE). The Claimant's contention that Dr. Govindan's hypothetical be used is without merit. As discussed above, Dr. Govindan's opinion was not based on medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with other substantial evidence in the case record. Therefore, ALJ posed a properly hypothetical to the VE.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ properly considered the Claimant's subjective complaints of pain. Also, the ALJ gave proper weight to the medical opinions of Dr. Govindan, Dr. Payne and Dr. Nally. Finally, the ALJ posed a proper hypothetical to the VE.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of record. Failure to timely file objections to the Report and

Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to parties who appear *pro se* and any counsel of record, as applicable.

DATED: June 14, 2005

/s/ James E. Seibert
JAMES E.  SEIBERT
UNITED STATES MAGISTRATE JUDGE
